FILED

2022 Mar-23  PM 03:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

VANUEL HARRIS,                          )
                                        )
            Plaintiff                   )
                                        )
      vs.                               )      Case No.   2:20-cv-00887-HNJ
                                        )
SOCIAL SECURITY ADMINISTRATION,         )
COMMISSIONER,                           )
                                        )
            Defendant                   )

## MEMORANDUM OPINION

Plaintiff Vanuel Harris seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding his claim for supplemental security income benefits. The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder. The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 14).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   20 C.F.R. § 416.905(a).   To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process.   *See* 20 C.F.R. § 416.920(a)(4).   The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far.   *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity.   20 C.F.R. § 416.920(b).   Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ."   *Id.* at § 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00–114.02.   *Id.* at § 416.920(d).   If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any

2

person from performing substantial gainful activity. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.925. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 416.920(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 416.920(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20 C.F.R. §§ 416.912(b)(3), 416.920(g). If the claimant can perform other work, the

3

evaluator will not find the claimant disabled.   *See id.* § 416.920(a)(4)(v); *see also* 20 C.F.R. § 416.920(g).   If the claimant cannot perform other work, the evaluator will find the claimant disabled.   20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"   *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.   *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   *Id.* (citations omitted).   Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision.   *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Mr. Harris, age 46 at the time of the ALJ hearing, protectively filed an application for supplemental security income benefits on March 13, 2017, alleging disability as of December 31, 2015.   (Tr. 35, 40, 137).   The Commissioner denied Harris's claims, and Harris timely filed a request for an administrative hearing.   (Tr. 53-64, 73-90).   The Administrative Law Judge ("ALJ") held a hearing on December 4, 2018 (Tr. 35-52), and issued an opinion on October 2, 2019, denying Harris's claim.   (Tr. 16-30).

Applying the five-step sequential process, the ALJ found at step one that Harris did not engage in substantial gainful activity after March 8, 2017, his application date. (Tr. 21).   At step two, the ALJ found Harris had the severe impairments of obesity, asthma, hypertension, and peripheral venous insufficiency.   (*Id.*).   At step three, the ALJ found that Harris's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (Tr. 24).

Next, the ALJ found that Harris exhibited the residual functional capacity ("RFC")

> to perform sedentary work as defined in 20 CFR 416.967(a) except he can occasionally climb, balance, stoop, kneel, crouch, and crawl; he can never climb ladders; he can have no exposure to concentrated extreme cold, extreme heat, wetness, humidity, or pulmonary irritants; he can perform no work around unprotected heights or dangerous moving machinery; and he can never operate a motor vehicle as part of his job duties.

5

(Tr. 25).

At step four, the ALJ determined Harris could not perform his past relevant work as a transportation driver.   (Tr. 28).   However, at step five, the ALJ determined Harris could perform a significant number of other jobs in the national economy considering his age, education, work experience, and RFC.   (*Id.*).   Accordingly, the ALJ determined that Harris has not suffered a disability, as defined by the Social Security Act, since March 8, 2017.   (Tr. 29).

Harris timely requested review of the ALJ's decision.   (Tr. 131-33).   On June 3, 2020, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision.   (Tr. 1-3).   On June 23, 2020, Harris filed his complaint with the court seeking review of the ALJ's decision.   (Doc. 1).

## ANALYSIS

In this appeal, Harris argues his breathing impairments meet or equal the requirements of Listing 3.03 for asthma (20 C.F.R. 404, Subpt. P, App. 1, Pt. A § 3.03). For the reasons discussed below, the undersigned concludes the ALJ properly considered Harris's disability status under Listing 3.03, and the record supports the ALJ's finding that Harris's asthma did not meet or medically equal the requirements of that listing.

Listing 3.03 requires a claimant to satisfy two distinct subparts.   Subpart A requires a claimant's spirometry test results to fall below a specified forced expiratory

6

volume (FEV$_1$) value based upon the claimant's height.   For Harris's height of 72 inches (Tr. 55, 293, 378) his FEV$_1$ value would need to equal or fall below 2.45.   20 C.F.R. 404, Subpt. P, App. 1 § 3.03(A).   Subpart B requires proof of

> [e]xacerbations or complications requiring three hospitalizations within a 12-month period and at least 30 days apart (the 12-month period must occur within the period we are considering in connection with your application or continuing disability review).   Each hospitalization must last at least 48 hours, including hours in a hospital emergency department immediately before the hospitalization.   Consider under a disability for 1 year from the discharge date of the last hospitalization; after that, evaluate the residual impairment(s) under 3.03 or another appropriate listing.

20 C.F.R. 404, Subpt. P, App. 1 § 3.03(B).   The test results in subpart A must originate "within the same 12-month period as the hospitalizations in 3.03B."   *Id.* § 3.03(A).

The ALJ found that Harris's breathing condition neither met nor medically equaled the requirements of Listing 3.03.   (Tr. 24).   Harris challenges only the ALJ's finding regarding medical equivalence.

Social Security regulations provide the following guidance for evaluating medical equivalence:

> (a) What is medical equivalence? Your impairment(s) is medically equivalent to a listed impairment in appendix 1 of subpart P of part 404 of this chapter if it is at least equal in severity and duration to the criteria of any listed impairment.
>
> (b) How do we determine medical equivalence? We can find medical equivalence in three ways.

(1)      (i) If you have an impairment that is described in the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter, but—

(A) You do not exhibit one or more of the findings specified in the particular listing, or

(B) You exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing,

(ii) We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.

(2) If you have an impairment(s) that is not described in the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter, we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing.

(3) If you have a combination of impairments, no one of which meets a listing described in the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter (see § 416.925(c)(3)), we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing.

20 C.F.R. § 416.926(a)-(b).

As Harris suffers from asthma, a listed impairment, 20 C.F.R. § 416.926(b)(1) governs the assessment of medical equivalence.  Under that provision, even though Harris did not exhibit one of the findings the listing specified (*i.e.,* three 48-hour

8

hospitalizations, 30 days apart, within a 12-month period), his condition still could medically equal the listing if other findings related to his asthma "are at least of equal medical significance" to those criteria.   20 C.F.R. § 416.925(b)(1)(ii).

At the hearing level, the ALJ determines medical equivalence after considering all the evidence about the claimant's impairment and its functional effects.   20 C.F.R. §§ 416.926(c), (e)(3).   The ALJ may consider "the opinion given by one or more medical or psychological consultants designated by the Commissioner."   20 C.F.R. § 416.926(c).

In the present case, the ALJ submitted Medical Interrogatories to Dr. Allen Goldstein after the administrative hearing, and Dr. Goldstein responded to those Interrogatories on July 22, 2019.   Dr. Goldstein stated Harris's medical impairments included gastro-esophageal reflux disease (GERD), diarrhea, bloody stool, morbid obesity, recurrent pneumonia, peripheral venous insufficiency, hypertension, asthma, anterior mediastinal lesion, post-concussion headaches, and rhinitis.   He concluded Harris's impairments medically equaled Listing 3.03(A)&(B).   (Tr. 378-79).

Dr. Goldstein cited several medical records to support that conclusion, including the May 16, 2018, consulting report from Dr. Dallas Russell.   (Tr. 378).   Dr. Russell stated Harris's

> major problems are respiratory-wise.   He had asthma as a child and it runs strongly in his family.   He has it year-round and he uses inhalers.   He

estimates he can walk about a block before he becomes short of breath. He does get short of breath going up steps.   He will have wheezing.   He has also had recurrent bouts of bronchitis.   He has gone to the emergency room with bronchitis.   He's also had pneumonia 4 xs over the last 6 years and has been hospitalized twice with it.   He has had pulmonary edema before.   He has had allergic rhinitis and he's had multiple allergies to dust and pollen.   He has trouble when there is an ozone alert.   He won't go outside.

(Tr. 296).   The physical examination of Harris's chest revealed clear lungs and no wheezing, rhonchi, rales, or decreased breath sounds. (Tr. 298).   Among other impairments, Dr. Russell assessed asthma, bouts of bronchitis, repeated bouts of pneumonia, pulmonary edema, and allergic rhinitis.   (Tr. 299).

Dr. Russell opined Harris could continuously lift and carry up to 20 pounds and frequently lift and carry 20-100 pounds.   (Tr. 303).   He could sit four to five hours at a time, and a total of seven hours, in an eight-hour workday.   He could stand for three hours at a time, and for a total of four hours.   He could walk for 30 minutes at a time, and for a total of two hours.   He could ambulate without assistance.   (Tr. 305).   He experienced no limitations on using his hands, feet, or vision.   (Tr. 306-07).   Due to obesity and asthma, he could frequently balance, but he could only occasionally climb, stoop, kneel, crouch, and crawl.   (Tr. 307).   Due to asthma and allergies, he could never tolerate exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat.   He could frequently tolerate exposure to vibrations. (Tr. 308).   He could shop, travel without a companion, ambulate without assistance,

walk a block at a reasonable pace on rough or uneven surfaces, use public transportation, climb a few steps at a reasonable pace with the use of a single handrail, prepare a simple meal, feed himself, care for his personal hygiene, and sort, handle, and use paper and files.  (Tr. 309).

After citing Dr. Russell's assessment, Dr. Goldstein hand-wrote the following note:  "not meeting a listing."  (Tr. 378).  The court concurs that Dr. Russell's assessment constitutes substantial evidence to support a finding that Harris did not satisfy Listing 3.03, as Harris did not undergo the requisite number of hospitalizations during a 12-month period.

Dr. Goldstein also referenced Dr. J.L. Zaremba's February 25, 2019, consultative report.[2]  Dr. Zaremba documented the following symptoms:

> 46-year-old male complaining of shortness of breath.  He states he's had recurrent pneumonias.   He may have had some heart failure with increased fluid buildup.  He uses his rescue inhaler regularly during the day of at times.  [*sic*].  He can walk perhaps for 10 minutes before having to stop because of shortness of breath.  He avoids a flight of stairs because of shortness of breath.  He can attend to his activities of daily living.   He is right-hand dominant.   He does not use a cane for ambulation.  He may have to rest frequently because of shortness of breath during much of his complex activities.  He's had a history of postconcussion syndrome.  He's also had allergic rhinitis sinusitis.  He was last in the emergency room in December 2018.  He does use a tapering dose of steroids for exacerbations of his asthma.

---

[2] Dr. Goldstein questioned whether Dr. Zaremba dated his report in 2015 or 2019 (Tr. 378), but the court reads the date as 2019.   (Tr. 368, 370).

(Tr. 359).    The physical examination of Harris exhibited clear lungs but with distant breath sounds.    (Tr. 360).    Among other conditions, Dr. Zaremba assessed "moderately severe persistent asthma with flare ups perhaps every month or 2[,] recently was sent into the emergency room in December 2018.   He uses inhalers regularly."   (Tr. 361).

Dr. Zaremba appended a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" form to his report.   However, the report did not contain a patient's name or Social Security number, as the author of the form had erased those fields.   (Tr. 363).   The individual the assessment covered could occasionally lift and carry up to ten pounds, but he could never lift or carry more than ten pounds.   (*Id.*).   He could sit for one to two hours at a time, and for a total of four hours in an eight-hour workday.   He could stand for 30 minutes at a time, and for a total of one hour.   He could walk for ten to 15 minutes at a time, and for a total of three hours.   He did not need assistance with ambulation.   (Tr. 364).   He could frequently reach, handle, finger, and feel with both hands, but he could only occasionally push and pull.   He could occasionally use both feet to operate foot controls.   (Tr. 365).   He could occasionally stoop and climb ramps and stairs, but he could never climb ladders or scaffolds, balance, kneel, crouch, or crawl.   (Tr. 366).   He could occasionally tolerate exposure to moving mechanical parts, operating a motor vehicle, and vibrations, but he could never tolerate exposure to unprotected heights, humidity, wetness, dust, odors,

12

fumes, pulmonary irritants, or extreme cold and heat.   (Tr. 367).   He could not walk a block at a reasonable pace on rough or uneven surfaces or sort, handle, and use paper files.   However, he could shop, travel without a companion, ambulate without assistance, use public transportation, climb a few steps at a reasonable pace with the use of a single handrail, prepare a simple meal, feed himself, and care for his personal hygiene.   (Tr. 368).

Upon citing Dr. Zaremba's assessment, Dr. Goldstein commented "markedly limited."   (Tr. 378).   The court concurs that Dr. Zaremba's assessment encompassed significant limitations, but as discussed more fully below, it does not constitute evidence of medical equivalence to the pertinent listing.

Finally, Dr. Goldstein referenced a March 15, 2019, pulmonary function report. The spirometry results reflected a $FEV_1$ value of 2.03, which Dr. Goldstein correctly noted fell below the threshold value for the Listing.   (Tr. 373, 378).

Dr. Goldstein stated that Harris's pulmonary function tests "meet listing but done in 2019, history of asthma documented to 1/4/17."   (Tr. 379).   He could not find sufficient information for an onset date of December 31, 2015, but he opined Harris equaled the listing as of January 4, 2017.   (Tr. 379-80).

The ALJ found Dr. Goldstein's opinion did not support a finding that Harris

equaled Listing 3.03, and he afforded the opinion little weight.[3]   (Tr. 24, 28).   He

stated:

> [I]t is unclear how Dr. Goldstein reached a conclusion that [Harris]
> equaled the listing, as of January 4, 2017.   The record simply fails to
> establish that asthma causes any regular symptoms or more than rare
> medical care to specifically address asthma.   In addition, the only
> relevance to the date cited by Dr. Goldstein, January 4, 2017, is that it is
> the first treatment note after the claimant's alleged onset date, when the
> claimant presented to establish care.   The record does not even indicate
> that the claimant alleged having asthma at that point.   He did alleged [*sic*]
> having recurrent episodes of pneumonia since turning age 40 and also
> alleged that a CT scan made in December 2016 had shown "something
> like asbestosis" but he denied any long term exposure to asbestos . . . .
> When he returned in March 2017, he alleged he had been diagnosed with
> asthma in the past and for this reason, he had been unable to work.   It
> was also noted that he was "looking for some type of disability to help
> supplement his income."   It was during this visit that he was assessed
> with mild persistent asthma, along with allergic rhinitis, and he was advised
> to use Flonase and Singulair, as well as use ProAir HFA (as needed for
> wheezing) . . . .   As such, the treatment record does not support a finding
> of meeting or equaling listing 3.03.

(Tr. 24).

Harris asserts the ALJ improperly evaluated Dr. Goldstein's opinion.   To

determine the weight due a medical opinion, an ALJ must consider several factors,

including the examining relationship, the treatment relationship, the evidence presented

to support the opinion, the consistency of the opinion with other evidence, and the

---

[3] The ALJ also found Harris did not meet the Listing because, though Harris's $FEV_1$ numbers fell
below the Listing threshold in 3.03(A), he did not have the number of hospitalizations 3.03(B)
requires.   (Tr. 24).   Harris does not challenge that finding.

specialization of the medical professional. 20 C.F.R. § 416.927(c); *see Davis v. Comm'r of Soc. Sec.*, 449 F. App'x 828, 832 (11th Cir. 2011) (stating that the ALJ generally will give more weight to the medical opinions of a source who has examined the plaintiff and opinions that are supported by medical signs and findings and are consistent with the overall "record as a whole").[4]   The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion.   *Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) (citing *Bloodsworth*, 703 F.2d at 1240).   However, the ALJ must "state with at least some measure of clarity the grounds for his decision."   *Winschel*, 631 F.3d at 1179.   This measure of clarity requires the ALJ to state the weight given to each medical opinion and the reason therefor.   *Id.*

The ALJ appropriately stated he afforded Dr. Goldstein's opinion little weight, and he thoroughly explained the reasons for that determination.   He also explained that he afforded Dr. Russell's assessment partial weight, and he afforded Dr. Zaremba's assessment little weight.   (Tr. 27-28).   Those explanations bear significance because Dr. Goldstein stated he relied upon Dr. Russell's and Dr. Zaremba's assessments.

The ALJ explained that he afforded Dr. Russell's assessment only partial weight because Dr. Russell overestimated Harris's lifting abilities.   According to the ALJ, even

---

[4] The court notes Harris filed his claim for benefits prior to the March 27, 2017, revisions to the regulations governing the consideration of medical evidence.   Therefore, the court will apply the previous version of the regulations, not the revised version.   *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867 (Jan. 18, 2017) (codified at 20 C.F.R. § 416.920c).

without considering any other conditions, Harris's morbid obesity likely would prevent him from frequently lifting 100 pounds.   The ALJ also concluded that Harris's asthma, though not as severe as he alleged, would reasonably cause some limitations on standing and walking.   Consequently, he determined Harris could perform only sedentary work, not heavy work, as Dr. Russell had assessed.   (Tr. 27).   That explanation provides the requisite level of clarity for the basis of the ALJ's decision.

The ALJ also explained that he afforded Dr. Zaremba's assessment little weight, as Dr. Zaremba appeared to base his opinion "primarily on the claimant's self-reported limitations," and "Dr. Zaremba's examination did not produce results to support the limitations assessed."   (*Id*.).   In addition, the ALJ stated Dr. Zaremba's notation of asthma flare-ups "'perhaps' every month or two" did not find support in the record. (*Id*.).   He also correctly noted Dr. Zaremba's "Medical Source Statement of Ability To Do Work-Related Activities" form did not contain Harris's, or any other claimant's, name, so "it is impossible to ascertain as to whether the opinion pertains to" Harris. (Tr. 27-28).   However, even assuming the assessment did pertain to Harris, the ALJ concluded

> Dr. Zaremba's assessment that [Harris] could lift no more than ten pounds is inconsistent with the treatment record as a whole, and there is no evidence to support any manipulative limitations.   Additionally, the significant lower extremity limitations assessed by Dr. Zaremba are not consistent with his finding of 1+ edema.

16

(Tr. 28).   As with the ALJ's discussion of Dr. Russell's opinion, that explanation provides the requisite level of clarity for the basis of the ALJ's decision.

To the extent Harris argues the court should apply a higher standard for reviewing the ALJ's decision to reject the opinion of a consulting medical professional the Social Security Administration hired, the court rejects that argument.   Harris cites a Seventh Circuit case, *Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995), that the Eleventh Circuit has repeatedly declined to follow.   *See, e.g., Hand v. Social Security Administration,* 786 F. App'x 220, 226 (11th Cir. 2020); *Jackson v. Social Security Administration, Comm'r,* 779 F. App'x. 681, 685 (11th Cir. 2019); *Arnold v. Social Security Administration,* 724 F. App'x. 772, 779 n.3 (11th Cir. 2018).

Moreover, substantial evidence supports the ALJ's decision to reject the opinions of Drs. Goldstein, Russell, and Zaremba, and to conclude Harris did not medically equal Listing 3.03.   Though Harris displayed $FEV_1$ levels that satisfy subpart A of Listing 3.03, no substantial evidence exists that Harris's asthma was sufficiently medically significant as to warrant three 48-hour hospitalizations within a 12-month period, given that no such hospitalizations occurred, pursuant to subpart B.

As the ALJ observed, when Harris established care at UAB Kirklin Clinic on January 4, 2017, he informed Dr. Fuqua he had experienced recurrent pneumonia and "something like asbestosis," but he did not mention asthma, and the clinical

examination revealed clear lungs, non-labored respirations, and equal breath sounds. (Tr. 233-35).

On March 7, 2017, Harris reported he had received an asthma diagnosis in the past, and "because of this he has been unable to work." He also stated he was "looking for some type of disability to help supplement his income." (Tr. 238). He complained of congestion and sore throat upon first awakening, but he did not experience those symptoms at the time of the examination, which occurred in the afternoon. (*Id*.). He also did not experience any shortness of breath or cough. Dr. Fuqua assessed "mild persistent asthma," and he prescribed Singulair and an inhaler. (Tr. 239, 242). The clinical examination revealed clear lungs, non-labored respirations, and equal breath sounds. (Tr. 240). A CT scan revealed a mediastinal mass but "[n]o new or worsening lung disease." (Tr. 244).

On October 1, 2017, Harris presented to the UAB emergency department with shortness of breath and symptoms of pneumonia, including drainage running into his chest; coughing with thick, dark sputum production; fever; and chills. (Tr. 248, 251). The clinical examination revealed wheezing and labored breathing. (Tr. 250, 252). Harris reported not using the inhalers his previous doctors had prescribed after the prescription ran out several years ago. (Tr. 261). The hospital admitted him for treatment of pneumonia, and he discharged on October 5, 2017. (Tr. 248-78).

18

On October 11, 2017, Harris returned to the Kirklin Clinic for a follow-up of his hospital admission.  He said he felt "1 million times better" since his hospitalization, and he denied shortness of breath, wheezing, and cough.  The physical examination revealed clear lungs, non-labored respirations, and equal breath sounds.  (Tr. 291-94, 329-32).

On October 26, 2017, Harris presented to the UAB emergency department with complaints of headaches since a motor vehicle accident two weeks prior.  He denied experiencing shortness of breath or cough.  The emergency department physician noted Harris had a history of mild persistent asthma.  The physical examination revealed clear lungs and non-labored respirations.  UAB did not admit Harris, but discharged him home the same day.  (Tr. 318-21).

On November 16, 2017, Harris returned to the UAB Kirklin Clinic complaining of headaches, but he stated his medications adequately controlled his asthma.  He denied experiencing shortness of breath or cough.  Dr. Fuqua stated Harris suffered from mild persistent asthma.  The physical examination revealed clear lungs, non-labored respirations, and equal breath sounds.  Harris presented a stable condition on medications, which Dr. Fuqua continued.  (Tr. 285-90, 333-37).

On December 29, 2017, Harris underwent a chest MRI, which revealed a mediastinal lesion with characteristics of a thymic cist, but less prominent than on previous viewings, and no significant new abnormalities.  (Tr. 283-84, 338-39).

On March 30, 2018, Harris complained of sinus pressure, congestion, thick nasal drainage, and coughing up yellow phlegm.   He denied any shortness of breath or chest pain.   He had not used his inhalers for his asthma because they often made him feel worse.   The examination revealed clear lungs, non-labored respirations, and equal breath sounds.   A chest x-ray showed faint interstitial opacities but no pleural effusions or pneumothorax.   The physician assessed Harris with an acute sinus infection and prescribed steroids and antibiotics.   (Tr. 311-16, 340-44).

During the evening hours of October 8, 2018, Harris presented to the UAB emergency department with complaints of chest congestion and possible pneumonia. He reported shortness of breath and cough, but he denied chest pain.   He acknowledged a history of asthma, but he said he had not used his inhaler "in a while." (Tr. 322).   The examination revealed non-labored respirations but crackles and wheezes present in breath sounds.   The emergency department physician ordered breathing treatments, antibiotics, and steroids.   A chest x-ray revealed mild bilateral interstitial prominence, worsened compared to prior finding, and consistent with pulmonary edema.   However, it detected no pleural effusion.   Harris's wheezing improved significantly after breathing treatments.   UAB did not admit Harris, but discharged him home early the following morning, with prescriptions for an inhaler, a steroid, and an antibiotic.   (Tr. 322-28, 345-51).

On October 24 and November 6, 2018, Harris saw Dr. Hector Caballero, a neurologist, for headaches.   He denied wheezing, coughing, and shortness of breath. The pulmonary examination revealed normal breath sounds.   (Tr. 354-55).

Those records primarily reveal mild to moderate asthma symptoms that abated when Harris used his prescribed medications.   Harris suffered a interstitial abnormality, consistent with some pulmonary edema, but most descriptions characterized that condition as mild and not worsening, and in any event, the record does not indicate the condition caused a worsening of Harris's asthma symptoms.   Harris suffered recurrent sinus infections and/or bouts of pneumonia, but only one so severe that it warranted an extended hospitalization.   Indeed, despite one other emergency department visit for congestion and/or pneumonia, and one visit for unrelated headaches, UAB chose not to admit him.   Thus, the record evidence indicates Harris did not suffer asthma symptoms equivalent in severity to those that would warrant three 48-hour hospitalizations within a 12-month period, as subpart B of Listing 3.03 requires.

The accepted medical opinions in the record also do not support a finding of symptoms sufficiently severe to warrant repeated extended hospitalizations.   On April 14, 2017, Dr. Richard Whitney, the state agency physician, did not find Harris met the requirements of Listing 3.03.   (Tr. 58).   He considered Harris's diagnosis of mild persistent asthma and his stable anterior mediastinal mass, but when assessing Harris's residual functional capacity, he accommodated the asthma symptoms by assessing

21

environmental limitations including avoiding concentrated exposure to extreme cold and heat, wetness, and humidity, and avoiding even moderate exposure to fumes, odors, dusts, gases, poor ventilation, and hazards like machinery and heights.  (Tr. 60-61). Those moderate findings do not substantially support a finding that Harris would suffer the equivalent of three 48-hour hospitalizations during a 12-month period.

In addition, Dr. Fuqua, Harris's treating physician at UAB Kirklin Clinic, completed a Physical Capacities Evaluation form on October 11, 2017.  He stated Harris could lift and carry 20 pounds occasionally and ten pounds frequently.  He could sit for six hours and stand or walk for three hours in an eight-hour day.   He did not need an assistive device to ambulate.  He could frequently push and pull with his arms and legs, climb, balance, perform fine manipulation, bend, stoop, and endure environmental problems like allergens and dust.  He could occasionally reach and perform fine manipulation.   He could rarely operate motor vehicles and work around hazardous machinery.  He would miss more than four days of work each month due to his impairments. (Tr. 279).

Dr. Fuqua also completed a Medical Statement Regarding Chronic Obstructive Pulmonary Disease for Social Security Disability Claim Where Smoking Is Issue on October 24, 2017.  He stated Harris suffered from asthma, but he did not have a significant smoking history.  He opined Harris could sit and stand for 15 minutes at a time, but he could work for eight hours a day.   He could lift ten pounds occasionally

and five pounds frequently.   He could not tolerate dust, smoke, or fumes.   (Tr. 280-81).

Dr. Fuqua offered conflicting opinions that the record does not explain.   In his first assessment, he stated Harris could lift and carry ten to 20 pounds, but in the second assessment, only 13 days later, he stated Harris could lift and carry only five to ten pounds.   In the first assessment, he stated Harris could endure environmental allergens like dust, but in the second assessment, he stated Harris could not tolerate dust, smoke, or fumes.   However, even the lower lifting limitations and the restrictions on environmental allergens would not substantially support a finding that Harris would suffer the equivalent of three 48-hour hospitalizations during a 12-month period, especially considering that Dr. Fuqua opined Harris could work eight hours a day.

As previously discussed, Dr. Russell's physical examination revealed clear lungs and no wheezing, rhonchi, rales, or decreased breath sounds.   (Tr. 298).   Though Dr. Russell stated Harris would experience sensitivity to environmental irritants like heat, cold, humidity, noise, and vibration (Tr. 299, 308), those sensitivities could arise from mild to moderate asthma, and they do not substantially support a finding that Harris would suffer the equivalent of three 48-hour hospitalizations during a 12-month period.

In addition, as previously discussed Dr. Zaremba's examination revealed clear lungs and only distant breath sounds.   (Tr. 360).   Though Dr. Zaremba stated Harris experienced "moderately severe persistent asthma with flare ups perhaps every month

or 2," Dr. Zaremba's normal to mild examination findings and the mostly mild asthma findings in the remainder of the medical record do not support that assessment.   (Tr. 361).

## CONCLUSION

In summary, the ALJ properly considered Harris's disability status under Listing 3.03, and the record supports the ALJ's finding that Harris's asthma did not satisfy the requirements of that listing.   Accordingly, the court **AFFIRMS** the Commissioner's decision.   The court will enter a separate final judgment.

**DONE** this 23rd day of March, 2022.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE